UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| DONNIE PARKER d/b/a SPRING CREEK RANCH, Individually and on Behalf of all Others Similarly Situated, | § § § § § § § § | |
| *Plaintiffs,* | § § § | |
| v. | § § | CAUSE NO: 24-78 |
| XCEL ENERGY SERVICES, INC., SOUTHWESTERN PUBLIC SERVICE COMPANY DBA XCEL ENERGY, & OSMOSE UTILITIES SERVICES, INC., | § § § § § § | |
| *Defendants.* | § § | JURY TRIAL DEMANDED |

## SMOKEHOUSE CREEK FIRE CLASS ACTION COMPLAINT

Plaintiffs Donnie Parker d/b/a Spring Creek Ranch, Individually and on Behalf of all Others Similarly Situated (the "Smokehouse Victims") brings this putative class action against Defendants Xcel Energy Services, Inc., Southwestern Public Service Company dba Xcel Energy (together, "Xcel"), and Osmose Utility Services, Inc.  (collectively, "Defendants" or the "Smokehouse Utilities").

## INTRODUCTION

1.     This is a class action brought by and for affected landowners asserting negligence against the Smokehouse Utilities for their role in causing the Smokehouse Creek Fire and widespread catastrophic damage to their land and ability to use it.

2.     On or about February 26, 2024, an electrical line pole (the "Utility Pole") controlled or maintained by the Smokehouse Utilities in Hutchinson County, Texas cracked at its base and crashed to the ground, igniting the Smokehouse Creek Fire, the largest wildfire in Texas history. By the time it was fully contained, the Smokehouse Creek Fire had killed two people, burned over one-million acres (1,654 square miles), and destroyed numerous properties and thousands of livestock. That is, the fire and its aftermath touched everyone and everything in the northeastern Panhandle region.

3.     Xcel's statements concerning this catastrophe are troubling. During a Texas House of Representatives committee hearing on the Smokehouse Creek Fire, Xcel noted that Osmose had

flagged the Utility Pole for immediate replacement in as early as January 2024, but the Smokehouse Utilities "did not replace the pole in the weeks between when we received the inspection information from Osmose on Feb. 9 and when it broke in the high winds of Feb. 26, starting the fire . . . . Obviously, I wish we could turn back the clock and replace the pole that day."[1] These statements are glaring admissions of liability. What's more, in February 2023, Xcel sought approval from the Texas Public Utility Commission for multi-million-dollar rate increases to its customers. The purpose for this increase, in part, was to continue efforts in "wildfire mitigation activity to protect our communities and utility infrastructure."[2] In April 2024, the PUC granted Xcel's request.

4.      In addition to the lives and livelihoods lost, the Smokehouse Creek Fire's economic toll has been estimated to be in the billions of dollars.  This class action seeks to recover the billions of dollars in losses for the class members.

## PARTIES

5.      Donnie Parker d/b/a Spring Creek Ranch is an individual and the legal owner of a 10,000-acre ranch and cattle operation located at 10287 County Road X, Skellytown, Texas 79080.

6.      Defendant Xcel Energy Services, Inc. ("Xcel") is a corporation incorporated in Delaware with its principal place of business located at 414 Nicollet Mall, Minneapolis, Minnesota 55401. This defendant may be served with citation by serving its registered agent, Corporation Service Company, dba CSC-Lawyers Incorporating Service Company, 211 E. 7th Street, Suite 620, Austin, Texas 78701-3218.

7.      Defendant Southwestern Public Service Company d/b/a Xcel Energy ("Southwestern") is a corporation incorporated in New Mexico with its principal place of business located at 414 Nicollet Mall, Minneapolis, Minnesota 55401. This defendant may be served with citation by serving its registered agent, Corporation Service Company, dba CSC-Lawyers Incorporating Service Company, 211 E. 7th Street, Suite 620, Austin, Texas 78701-3218.

---

[1] Amarillo Globe-News, In Texas House Hearing, Xcel Energy says pole that started Panhandle wildfire needed replacement (Updated April 5, 2024, 1:30 PM), https://www.amarillo.com/story/news/2024/04/04/xcel-says-pole-that-started-texas-panhandle-wildfire-needed-replacement/73202525007/.
[2] Letter to Chairman Lake and Commissioners McAdams, Cobos, Glofelty, and Jackson from Adrian J. Rodriguez, President, Southwestern Public Service Company (Feb. 8, 2023), https://interchange.puc.texas.gov/search/documents/?controlNumber=54634&itemNumber=2.

8.      Defendant Osmose Utility Services, Inc. ("Osmose") is incorporated in the state of Delaware, with its principal place of business at 191 Peachtree Street, Atlanta, Georgia, 30303. This defendant may be served with citation by serving its registered agent, Corporation Service Company, dba CSC-Lawyers Incorporating Service Company, 211 E. 7th Street, Suite 620, Austin, Texas 78701-3218.

## JURISDICTION & VENUE

9.      The Court has subject matter jurisdiction over this action, pursuant to 28 U.S.C. § 1332(d)(2), because this is a class action in which at least one member of the class is a citizen of a state different from that of at least one Defendant, the amount in controversy exceeds $5 million exclusive of interests and costs, and the proposed class contains more than 100 members. The Court may also separately exercise subject matter jurisdiction under 28. U.S.C. § 1332(a) as there is complete diversity between the parties.

10.     The Court has personal jurisdiction over Defendants because Defendants have substantial contacts with Texas. At all relevant times, Defendants purposefully availed themselves of the benefits and protections of Texas by continuously and systematically conducting business so substantial as to render them at home there. The assumption of jurisdiction over Defendants will not offend traditional notions of fair play and substantial justice and is consistent with due process. All Defendants maintain a registered agent in Texas. All Defendants market and sell their services and transact business in and directed towards Texas.

11.     Pursuant to 28 U.S.C. § 1391, venue is proper because a substantial part of the events or omissions giving rise to the alleged claims occurred or originated in this federal district.

## FACTS

12.     Residents of the Texas Panhandle are accustomed to dealing with wildfires, a common concern when conditions are dry and windy. In the days leading up to the Smokehouse Creek Fire, as is typical, wildfires burned in other regions of the Panhandle and were a top topic of discussion on news outlets, social media, and among the communities' members. As a community, the Smokehouse Victims understand that preventing these blazes requires common sense preventative measures that are non-negotiable and time sensitive.

13.     Plaintiff Spring Creek Ranch, like most properties in the Panhandle, was a working cattle operation prior to the Smokehouse Creek Fire.  According to the Texas Department of Agriculture, eighty-five percent of the state's cattle population is located on ranches in the Panhandle.

14.     Donnie Parker, the owner of Spring Creek Ranch, has been a cattleman for seventy years since he received his first cow at the age of six years old.

15.     In the days preceding Feb. 26, weather services issued alerts concerning the favorable conditions for wildfires. There had been no rain and the temperature averaged in the high 70s; strong winds were forecast for the week of February 26.

16.     About a mile north of Stinnett, Texas, the Utilities' Fallen Pole---cracked, chipped, creviced, and bent---stood teetering in the strengthening winds while supporting electrified lines. At some point on Feb. 26, the battered Utility Pole could no longer stand the winds, and it tumbled over, igniting the dry vegetation that lay beneath; spurred by the whipping winds, the small flame quickly grew into an inferno that would spread over six Texas counties and across state lines.

17.     The Smokehouse Creek Fire lasted roughly three weeks. During that time, Spring Creek Ranch's property was burned so thoroughly that it became unrecognizable and unusable by Spring Creek Ranch, along with countless other properties and tracts of land owned by class members. Without the ability to use its land, Spring Creek Ranch, like the other landowners, incurred costs associated with the loss of use of its land, direct out-of-pocket costs related to repair and restoration, losses from disruption of the cattle operation, and loss of real and personal property.



*Burned tree and land on Spring Creek Ranch.*



*Satellite view of the scorched earth within the Smokehouse Creek Fire's perimeter.*

18.     Spring Creek Ranch lost approximately 90% of its available grasses and rangeland due to the Smokehouse Creek Fire. Wildlife was destroyed and disrupted, buildings were burned down, equipment was ruined, fencing was destroyed, and livestock were killed and injured. Surviving livestock had to be relocated to rented pastures due to the barren landscape now

comprising Spring Creek Ranch. Where grasslands once were, sand dunes now are pushed by the wind due to the lack of grasslands.

19.     Xcel owns the Utility Pole, along with countless others that form Xcel's transmission network.

*20.*     Osmose, a utilities services company that provides "solutions for aging infrastructure" via inspection, life extension, or rehabilitation" had marked the Utility Pole as unsafe to climb and a top priority for replacement a month before the fire began. Some news outlets have reported that the Utility Pole showed signs of chop-marks at the point of failure, which may be evidence of a practice where an inspector chips away the surface wood to assess the strength of a pole's internal material. It is unclear why the Smokehouse Utilities did not act, and the Utility Pole was not replaced.



*Xcel removing the Utility Pole that started the Smokehouse Creek Fire.*



21.     It is clear, however, that the Smokehouse Utilities did not adhere to the regulatory and professional standards that govern the electric utility industry. For example, the National Electrical Safety Code (NESC) governs safety standards related to the design, construction, and maintenance of electrical utility infrastructure, including in Texas. Adherence to the NESC standards promotes the efficient and safe use of electrical power and drastically reduces the

chances of discrete personal injuries and widespread disasters. However, information currently available shows the Smokehouse Utilities failed to adhere to the NESC standards, leading to calamitous results. Similarly, the Texas Public Utility Commission obligates the Smokehouse Utilities to comply with storm hardening requirements and vegetation management and show compliance in a report filed annually. The Smokehouse Utilities' neglect in properly inspecting, maintaining, and repairing the Utility Pole, meant that hazardous conditions were not timely identified and remained unaddressed, leading to the ignition of the Smokehouse Creek Fire.

22.     It is not clear that the Smokehouse Utilities so complied. Such disregard for their statutory, administrative, and professional obligations highlights the Smokehouse Utilities' dereliction of duty that set off this tragic chain of events.

## CLASS ALLEGATIONS

23.     Pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(1)-(3), and/or 23(c)(4)-(5), Spring Creek Ranch, on behalf of itself and all others similarly situated, brings this class action, and seeks to represent the following Class: All persons or legal entities who owned rangelands and/or pastures which were negatively impacted by the Smokehouse Creek Fire and sustained damages to their property existing there.

24.     Excluded from the Class are Defendants, any entities in which Defendants have a controlling interest, any of Defendants' officers, directors, or employees, any of Defendants' legal representatives, heirs, successors, and assigns, anyone employed with Plaintiff's counsel firm, and any Judge to whom this case is assigned and his or her immediate family.

25.     **Numerosity.** The Class is so numerous that joinder of all members if impracticable. While the exact number of Class Members is information not readily available at this time, The Smokehouse Victims have reasonable belief that there are thousands of potential Class Members. A huge portion of the Panhandle of Texas, home to thousands of property owners and over 1,000,000 acres, was negatively impacted by the Smokehouse Creek Fire.

26.     **Typicality.** Spring Creek Ranch's claims are typical of the claims of Class Members they seek to represent because Spring Creek Ranch, and all Class Members, suffered damage to their property due to the Smokehouse Creek Fire. Typicality among Spring Creek Ranch and all

Class Members is inherent in each person's loss of use of their land, the destruction of flora and fauna (for example, pollinators and other beneficial insect), the loss of topsoil, the loss of grasses and erosion-control vegetation and any resulting erosion, real property improvements, trees, grazing pastures, personal property, livestock, fixtures, fences, gates, barriers, or man-made walls, among others.

27.    **Adequacy.** The Smokehouse Victims have retained counsel experienced in complex class action and consumer protection litigation. Spring Creek Ranch has no interests that are averse to or in conflict with other Class Members and will fully and adequately protect the interests of all Class Members.

28.    **Commonality.** All questions of law and fact common to Class Members predominate over any questions that may affect only individual members, namely whether: Defendants were negligent; Xcel and Osmose negligently undertook liability; the Smokehouse Creek Fire would not have ordinarily occurred in the absence of negligence; Defendants were grossly negligent; and Spring Creek Ranch and Class Members were harmed.

29.    **Superiority.** A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all Class Members is impracticable. The prosecution of separate actions by individual Class Members would impose a heavy burden on the judicial system and create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class. A class action would achieve substantial economies of time, effort, and expense and would assure uniformity of decision with respect to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.

30.    Class Members' interest in individually controlling the prosecution of separate actions is theoretical rather than practical. The Class is cohesive, and prosecution of the action through representatives would be unobjectionable. The damages suffered by the Class are uniform and generally formulaic, and the expense and burden of individual litigation could preclude them from fair redressal of the wrongs done to them. The Smokehouse Victims anticipate no difficulty in the management of this action as a class action.

**CAUSES OF ACTION**

A.    **Count 1: Negligence and Negligence Per Se Against the Smokehouse Utilities**

31.    The Smokehouse Victims incorporate by reference the preceding paragraphs.

32.    At all relevant times, the Utility Pole was owned, operated, and maintained by Xcel, and Xcel had non-delegable duty to construct, install, operate, maintain, and control the Utility Pole and consistent with NESC standards and professional requirements pertinent to the electric utility industry. These duties included the duty to consider, plan for, and promptly prevent or repair foreseeable weather-related damage and deterioration of the Utility Pole, along with foreseeable wear-and-tear.

33.    At all relevant times, Osmose worked under an inspection and maintenance agreement with Xcel that imposed on Osmose a duty of reasonable care to carry out its obligations in a manner consistent with NESC standards and regulatory and professional requirements; thus, Osmose, as the actor most closely observing the infrastructure, had a duty to inspect the infrastructure properly, identify safety issues, undertake and complete appropriate repairs and maintenance, report findings, provide warnings, and ensure that adequate measures were in place to prevent damage or failure due to foreseeable weather-related hazards.

34.    The Smokehouse Utilities' acts or omissions constitute negligence and/or negligence per se and proximately caused the Smokehouse Creek Fire that torched more than one-million acres of land, resulting in a myriad of damages to the Smokehouse Victims.

35.    The Smokehouse Utilities had a duty to conduct business in a reasonable, competent, and workmanlike manner so as not to injure the Smokehouse Victims' property.

36.    The Smokehouse Utilities had a duty to use reasonable care in the ownership and operation of their facilities.

37.    The Smokehouse Utilities owed a duty to care to avoid a foreseeable risk of injury to the Smokehouse Victims and to perform their work with adequate skill, professionalism, diligence, and effectiveness.

38.    The Smokehouse Utilities had a duty of care to the public to conduct business and

provide electrical transmission services in a workmanlike manner as would an ordinary and reasonable utility.

39.   The Smokehouse Utilities breached their duties by failing to:

a.   properly design, construct, install, maintain, inspect, repair, recognize, or report defects, failures, hazards, or other dangerous conditions concerning the Smokehouse Utilities' Pole that caused the Smokehouse Creek Fire;

b.   take routine and prompt action to properly design, construct, install, maintain, inspect, repair, recognize, or report defects, failures, hazards, or other dangerous conditions concerning the Smokehouse Utilities' Pole that caused the Smokehouse Creek Fire;

c.   exercise adequate oversight, direction, coordination, and supervision regarding the hiring of employees, third-parties, agents, contractors, or other actors to ensure compliance with applicable duties of care, NESC standards and regulatory and professional requirements;

d.   take routine and prompt action to identify and remedy threats to public or personal safety, fire hazards, and other dangerous conditions created by the operation of their businesses or use ordinary care under the circumstances;

e.   to comply with the Texas Public Utility Commission's requirements, including Texas Administrative Code § 25.95 (storm hardening) and Tex. Admin Code § 25.96 (vegetation management);

f.   construct, inspect, repair, maintain, and secure the Utility Pole to prevent the power lines from touching combustible materials, touching the ground, or otherwise creating conditions that caused the Smokehouse Creek Fire;

g.   comply with Texas Administrative Code § 25.101 and NESC 214 and 261, among other regulations and statutes;

h.   perform work while meeting duty of reasonable care, design specifications, industry standards, uniform and local codes, and/or other safety and regulatory provisions;

i.   adhere to utility maintenance standards in accordance with recognized and accepted industry standards and practices;

j.   recognize, consider, appreciate, and take appropriate precautionary safety measures to avoid conditions that could present an unreasonable risk of injury, harm, or damage to the Smokehouse Victims' property;

k.   undertake reasonable and adequate inspections of the subject electrical equipment and systems to ensure their fitness for use and ability to accommodate foreseeable circumstances capable of causing hazards, failures, or disasters, complied with all applicable codes and regulations, and was safe and fit for its intended and foreseeable use; and

l.   adequately train and supervise their employees, independent contractors, and sub-contractors to ensure that all work was performed properly and according to plans, specifications, and industry standards, consistent with applicable statutory, regulatory, and professional standards.

40.   The Smokehouse Utilities' negligence or negligence per se proximately caused the Smokehouse Creek Fire and the Smokehouse Victim's resulting damages.

### B.   Count 2 – Negligent Undertaking by Osmose

41.   The Smokehouse Victims incorporate by reference the preceding paragraphs.

42.   Osmose voluntarily contracted with Xcel to assume and perform Xcel's non-delegable duties zare in connection with its electrical transmission operations described above and received financial benefits in exchange for its promise to perform.

43.   Osmose breached its duty of care when it failed to perform or unsatisfactorily performed Xcel's duties, and thus Osmose's acts or omissions in this regard constitute negligence. Osmose's negligent performance of Xcel's non-delegable duties, voluntarily assumed, proximately caused the Utility Pole's failure, the Smokehouse Creek Fire, and The Smokehouse Victims' resulting damages.

44.   Osmose's negligence proximately caused the Smokehouse Creek Fire and the Smokehouse Victims' damages. Osmose breached its duties concerning inspection and reporting of defects of the Utility Pole, and Osmose's breaches were a proximate cause of the Smokehouse Creek Fire and the Smokehouse Victims' resulting damages.

### C.   Count 3 – Negligent Undertaking by Xcel

45.   The Smokehouse Victims incorporate by reference the preceding paragraphs.

46.   Xcel owns 100% of Southwestern's shares. As the owner of Southwestern, Xcel directly controlled Southwestern's assets and operations under which the Utility Pole failed, proximately causing the Smokehouse Creek Fire and the Smokehouse Victims' damages.

47.   The way Xcel exercised direct control over Southwestern constituted negligence, and Xcel's negligence proximately caused the Utility Pole's failure, the Smokehouse Creek Fire, and the Smokehouse Victims' damages.

**D.      Count 4 - Res Ipsa Loquitur**

48.     The Smokehouse Victims incorporate by reference the preceding paragraphs.

49.     At all relevant times, the Smokehouse Utilities exercised exclusive possession, management, and control over the instrument(s) that caused the Smokehouse Creek Fire and resulting damages; accordingly, the Smokehouse Utilities' agents, servants, or employees are liable under *res ipsa loquitur*.

50.     The Smokehouse Victims allege that Defendants, their agents, servants and/or employees are liable pursuant to the doctrine of *res ipsa loquitur*.

51.     The Smokehouse Utilities' negligent maintenance and operation of the Utility Pole that was within their exclusive possession and control of their agents, servants and/or employees caused the Smokehouse Creek Fire.

52.     The Smokehouse Utilities' agents, servants and/or employees solely responsible for maintenance and operation of the Utility Pole were obligated to exercise a high degree of care in these activities but failed to do so; had the Smokehouse Utilities' agents, servants and/or employees met their duty of care in performing their obligations concerning the Utility Pole, the Smokehouse Creek fire would not have occurred.

53.     The Smokehouse Utilities' agents, servants and/or employees possessed confidential materials, knowledge, and information about the wildfire risk and the cause of the Smokehouse Creek Fire.

54.     Accordingly, the Smokehouse Victims request the jury to infer the Smokehouse Utilities' negligence under *res ipsa loquitur*.

**E.      Count 5: Private Nuisance - Xcel**

55.     The Smokehouse Victims are current owners, past owners, or occupants of the land whose privileges and property rights to the use and enjoyment of the land were negatively affected by the Smokehouse Creek Fire.

56.     The Smokehouse Creek Fire substantially interfered with the Smokehouse Victims' interest in the use and enjoyment of their land, causing them unreasonable discomfort or annoyance; the Fire's interference was substantial because it extended over a long period of time,

involved a deadly element of nature, and created numerous impediments to daily life that would not have occurred but for the Smokehouse Creek Fire.

57.     The discomfort or annoyance was unreasonable because it completely disrupted the Smokehouse Victim's lives and involved the threat of destruction to life, limb, property, and livelihood.

58.     The Smokehouse's Utilities' conduct created the Smokehouse Creek Fire; and their conduct was intentional in that they took no action to address the Utility Pole's defects after receiving notice of the defects. Their conduct was negligent in that the Smokehouse Utilities knew or should have known of the unreasonable risk of interfering with or invading the Smokehouse Victim's interest in the use and enjoyment of their land. Further, the conduct was abnormally dangerous in that it involved the transmission of high-powered electrical currents capable of heating the air around it to 50,000 degrees Fahrenheit (five times hotter than the sun's surface), a temperature that can easily ignite vegetation or other naturally occurring combustible material.

59.     The Smokehouse Utilities' conduct was the proximate cause of the Smokehouse Creek Fire, and accordingly, was the proximate cause of the Smokehouse Victims' injuries to their interest in the use and enjoyment of their land, which resulting in economic and non-economic damages.

### F.     Count 6: Gross negligence – the Smokehouse Utilities

60.     The Smokehouse Victims incorporate by reference the preceding paragraphs.

61.     The Smokehouse Utilities acts or omissions, objectively viewed from their perspective at the time, entailed an extreme risk in terms of probability, magnitude, and potential harm to the Smokehouse Victims.

62.     The Smokehouse Utilities possessed actual subjective awareness of these risks but proceeded with conscious indifference towards the rights, safety, and welfare of the public, including the Smokehouse Victims. The Smokehouse Utilities are also accountable for the gross negligence of their vice principals, employees, and/or agents. The Smokehouse Utilities were negligent, reckless, and/or grossly negligent in their hiring and retention of ineffective, unpunctual, and un-engaged third-parties or agents to perform a job of utmost importance.   This grossly

negligent conduct proximately caused the Smokehouse Creek Fire and ultimately Spring Creek Ranch's damages.

## DAMAGES

63.     The Smokehouse Utilities' acts or omissions proximately caused catastrophic losses and damage to the Smokehouse Victims. The Smokehouse Victims' damages include the almost complete eradication of their rangelands, damage to real property, damage to personal property, loss of income, loss of use, loss of animals, and damage to their businesses.

64.     The Smokehouse Victims are entitled to recover attorneys' fees for prosecution of the claim for damages, injuries and death of livestock proximately caused by the Smokehouse Utilities.

65.     The Smokehouse Utilities' gross negligence, malice, or fraud proximately caused the Smokehouse Victims' damages, entitling them to exemplary damages.

66.     The Smokehouse Victims also seek pre- and post-judgment interest, court costs, and expenses.

## JURY DEMAND

67.     The Smokehouse Victims respectfully request a trial by jury.

RESERVATION OF RIGHTS

68.     The Smokehouse Victims specifically reserve the right to bring additional causes of action against Defendants and to amend this Class Action Complaint as necessary.

69.     All conditions precedent to the Smokehouse Victims' claims for relief have been performed or have occurred.

## PRAYER

The Smokehouse Victims pray that the Smokehouse Utilities be cited to appear and to answer herein and that, upon final hearing, the Court enter a judgment in favor of the Smokehouse Victims against Defendant Xcel Energy Services, Inc., Defendant Southwestern Public Service Company dba Xcel Energy, and Defendant Osmose Utilities Services, Inc., in an amount in excess of the minimum jurisdictional limits of this Court, for damages, as alleged herein, exemplary damages, prejudgment interest at the highest legal rate, post-judgment interest at the highest legal

rate, attorneys' fees, court costs, and for such other and further relief, general or special, both at

law and in equity, to which the Smokehouse Victims may show themselves to be justly entitled.

Respectfully submitted,

**Potts Law Firm, LLP**

*/s/ Derek Potts*

Derek Potts
Texas Bar No: 24073727
Ryan Fowler
Texas Bar No: 24058357
Bryce Romero
Texas Bar No. 24118515
3737 Buffalo Speedway
Suite 1900
Houston, Texas 77098
T: (713) 963-8881
F: (713) 583-5388
dpotts@potts-law.com
rfowler@potts-law.com
bromero@potts-law.com

**ATTORNEYS FOR PLAINTIFFS**